(No. 18284.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILBUR CARTER, Plaintiff in Error.

*Opinion filed October 22, 1927.*

1. CRIMINAL LAW—*conviction cannot be obtained by incompetent evidence.* It is not the duty of the State's attorney to endeavor to procure the conviction of a defendant by the introduction of incompetent evidence, and the court ought not to let a verdict stand which has been procured by such evidence.

2. SAME—*when conviction with capital punishment will be reversed for error in evidence.* Where conviction depends on the credibility of witnesses for the State as against the testimony of the defendant, the admission of incompetent testimony which, if believed by the jury, discredits the defendant as a witness, will require reversal of a conviction carrying capital punishment, where the evidence was objected to but no ruling was made thereon and no instruction given the jury to disregard it.

APPEAL from the Criminal Court of Cook county; the Hon. JACOB H. HOPKINS, Judge, presiding.

CHARLES C. ROE, (R. C. OLDHAM, and H. T. KRAFT, of counsel,) for appellant.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (EDWARD E. WILSON, HENRY E. AYERS, and LEE R. LA-ROCHELLE, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Wilbur Carter was convicted in the criminal court of Cook county of murder and sentenced to death, and on his motion a writ of error has been granted.

The murder was committed April 20, 1926. The victim of the crime, the plaintiff in error, and all who were present at its commission, were negroes. About nine o'clock in the evening a noisy, drunken crowd entered the Doug-

las Hotel, a family hotel, consisting of the second, third and fourth floors of the building at 3502 Vincennes avenue, Chicago. The plaintiff in error, Mark Walker, LeRoy McKnight, Lorenzo Early, Norman Hartsfield, Matthew Jones and a girl were in the crowd. Possibly there were others, but if so their names are not shown. While they were there Samuel Ware, who lived on the fourth floor, was killed by one of the crowd with a knife, which passed between the fourth and fifth ribs and pierced the heart. The landing in the central stairway of the building between the third and fourth floors was the place of the homicide. The second, third and fourth stories of the building are frequently referred to in the evidence as the first, second and third stories of the hotel. There is some apparent confusion in the evidence because of this, but the context usually defines the use of the terms intended by the witnesses. In this opinion the floors of the hotel will be referred to as the second, third and fourth. Of the participants in the riot, Early and Walker testified for the People, McKnight was called by the court at the instance of the People, and the defendant, Carter, testified in his own behalf. The occupants of the hotel who testified were Letitia Wigley, who was the proprietor and lived on the second floor, and Lucile Brown, Byron Adams and Lucius Davidson, who lived on the third floor. Most of the men who lived there were out at a political meeting. Adams was preparing to shave and his face was covered with lather. Lucile Brown lived across the hall from Adams with her mother, Mrs. Adams. Davidson had been in bed for fifteen or twenty minutes. Ware had at one time been partially paralyzed, walked with a limp and seldom went out at night.

The jury had before them a diagram showing the stairway leading from the third to the fourth floor and the landing, and a picture of the hallway, which are not in the abstract or record. The apartments of Adams and of

Lucile Brown and her mother were on a hallway running east and west, about twelve or fifteen feet from the main hallway, Adams' apartment fronting on Thirty-fifth street and the Brown apartment fronting on an alley. The building fronts both on Vincennes avenue and Thirty-fifth street. The stairway is about the center of the building. There are fifty-six rooms in the hotel.

Two of the witnesses, Early and Walker, testified that they saw Carter, the plaintiff in error, cutting Ware. Carter denied this. No other witness testified to having seen the occurrence. Early and Walker were part of the disorderly crowd, and their testimony was open to the suspicion of a motive to relieve themselves of danger of implication in the murder. They were the only eye-witnesses, and their testimony, unless inherently improbable or impeached in some way, was sufficient to justify the verdict.

Walker testified that he was employed at a barber shop and drug store at Forty-fifth street and Cottage Grove avenue, and on the occasion in question he started to the hotel to deliver some razor blades to a friend of his,—a man named Harris,—who lived there; that about midway down the block he met Early, who was going home, and whom he asked to come with him; that at Thirty-second street and Cottage Grove avenue they met Hartsfield, Jones and Carter, who were also asked to go along. At Jones' request they went to Jones' home to get his overcoat. At the hotel Walker asked on what floor Harris lived, and was told the third floor. On the third floor he asked a woman where Harris lived, and was told that he lived on the fourth floor. McKnight, Early, Hartsfield and Carter then went to the fourth floor and knocked on the door, but got no response though the light was burning. Walker said he would go to Miss Thurmon's room, on the same floor, and see if she knew where the place was. He left the others and was gone four or five minutes. On his return the others had gone. When he started down the stairs he saw

327—15

Carter cutting a man at the bend in the stairs. Walker jumped down the banister between the third and fourth floors, went past McKnight and the others, telling Mc-Knight as he went out that Carter was cutting a man, and didn't stop running till he reached Thirty-third street, where he was sitting, getting his breath, when Carter, McKnight and Early came together. Carter gave McKnight his knife and wiped blood off his hands with a handkerchief.

Early was a tailor, living at 3715 Langley avenue. He gave the same account of the meeting of the men and the purpose of the visit to the hotel that Walker gave. He went to the fourth floor with Walker, Jones, Hartsfield and Carter, knocked at the door and Miss Harris was not at home. Early, Walker and Jones then came down the stairs, and Walker went to see if he could find Miss Harris on one of the other floors. Early went down by himself to the second floor and Carter did not follow the three down. Early heard a lot of loud talking, heard Carter say, "I will kill you," ran back up the stairs between the third and fourth floors and saw Carter on the landing between the two floors with a knife in his hand, cutting Ware. Walker jumped over the railing, landing near Early on the stairway between the second and third floors. Early ran out, leaving the others, and went home. Later he was with Carter, McKnight, Hartsfield and Walker at Thirty-fourth street and Cottage Grove avenue, and there Carter gave his knife to McKnight and wiped the blood from his hands with his handkerchief.

Against the testimony of these two witnesses stands the testimony of McKnight, who was called by the court, and of the defendant. McKnight testified that he was a married man living with his wife and first met Walker and Early at Thirty-first street and Cottage Grove avenue. The three went to a pool-room about half a block away and there met Carter, Early, Jones and Hartsfield. Walker asked them to go to the Douglas Hotel. They were going

to a party. At McKnight's suggestion they first went to his home to get his coat. The girl, Lucile Cook, was there. They, including the girl, then went to the Douglas Hotel. McKnight and his girl, Lucile, stood there in the lobby, talking to the proprietor, Letitia Wigley, for about five minutes, during which time Walker, Early and Carter went up-stairs. He started up the stairs and met Carter coming down, who said there was no party up there; that he would go home because they were having a fight up there. He had no knife in his hand. McKnight, Carter and the girl then left the hotel and walked away together. As he left the hotel he heard the proprietor say, "I will call the police." At Thirty-first street and Cottage Grove avenue Carter said he was going home and left McKnight and the girl. Carter did not give him a knife, nor did McKnight see him again before his arrest.

Carter testified that he worked for the Hartford Waste Paper Company, baling paper, and lived with his mother and grandmother. On April 20, 1926, he quit work about 5:30 in the evening, went home and had supper. Between six and seven o'clock he left home and went to 3136 Ellis avenue, where he collected $2.50 which a plumber, Neilson, owed him. As he left Neilson's house he met two boys and a girl, with whom he agreed to go to 3247 Ellis avenue to shoot craps. No one came to the door there, and Carter walked to Thirty-first street and Cottage Grove avenue and bought a package of cigarettes. He then walked back to Ellis avenue, where he met Early and six or seven other men with two girls, all drunk. Walker, Early, McKnight and Hartsfield were of the crowd. Walker had a gallon jug which was nearly full of whiskey. They went to Charlie's house, at 5023 East Thirty-second street, to shoot craps with Carlton. Carlton slapped the girl Betty May, and asked Carter to take her home to her mother. Walker asked the crowd to go to a place where his girl was giving a party. They first went to McKnight's home

to get his coat and then to the hotel, where there were other boys looking around, who were, Walker said, "the party." There were ten or eleven of them. Carter continued: "Mark told us to follow him, so we went up the steps. LeRoy Early and myself and Lulu May Knight and a girl named Lula Baer and Mark came up the steps off of Vincennes avenue and went up the third floor. I was right behind Early and another boy whom I did not know, and the other boys were waiting in the hall. After we got up on the third floor I was standing on the stairs and bracing myself against the banister. Lorenzo had gone up the short hallway and Mark Walker had gone up the long hallway going east and west and they knocked on somebody's door and asked for Miss Harris. He asked somebody if there was a party there and they told him no, but he came on back to me and said, 'Wait a minute.' He went into another room where there was a victrola or a radio playing and tried to peek over the transom. When he got up to that room on the Vincennes side he stopped and he had a .25 automatic pistol. He came back and started up-stairs. When he started up-stairs the other boy talked loud, like they was arguing something, so I went behind and walked up-stairs. He said, 'He didn't live here and he ain't got no right to tell us to get out.' He had a big knife in his hand, and Mark, who had the pistol in his hand, ran up-stairs and said, 'Where is he?' When he said that I turned and started on back down the steps and met LeRoy McKnight coming up and told him that Mark Walker was up there fixing to fight and had a pop pistol in his hand. McKnight came on down-stairs, got the girl, and they walked to the lobby on the first floor and I told them to go home. He and I walked from the hotel to Thirty-fourth and Cottage, where we said good night, and he walked on down Thirty-fourth street and I walked on down Cottage Grove to Thirty-second, where I went into my house and got a dollar and went to Thirty-first and

Cottage to 5010 East Thirty-first to have my lunch. I was sitting there with five or more other people and had waited ten or fifteen minutes to get served when the police officers came in and said, 'What you all doing here?' They asked our names and where I lived and asked me where I had been, and I told him I had come from the Douglas Hotel, where I went to a party. There were three plain clothes officers and one with a uniform, and he asked me how long I stayed at the Douglas Hotel, and I told him about five or ten minutes, and told him I went there with Mark Walker." Carter further testified that he had no knife, did not cut Ware or have an altercation with him, did not give a knife to McKnight or wipe blood from his hands with a handkerchief, had never been in the hotel before, knew no one living there, and went to the hotel because Walker invited him to a party there, where they would get some whiskey.

Letitia Wigley testified: "A gang of men came up making a lot of noise and called for me. I recognized the voice of Mark Walker and was frightened, and saw that they had gone to the second floor of the building, which is the first floor of the part I occupy and where I have an office. There I heard Mark Walker hollering, and I called to him and asked him why he brought that gang there. He said he would stop them. I returned to my rooms, and then I heard a fall, but I did not know what it was. I went out and looked up for the boys on the second floor and saw Ware, and said to him, 'You had better get back, because I am afraid there will be trouble.' I judge that at least six people came in with Walker, who was the only one I knew, and there was one woman in the crowd. I don't know the defendant, Carter, and did not see him there. I went on to my room, where I heard a noise like someone was falling, and then the crowd jumped over the banisters and ran out. When I came out Mr. Davidson, one of the tenants, was there, and I went up-stairs and took hold of Ware's hand and asked, 'Where did they go?'

The only answer he gave was a moan. I then called for a doctor and sent Davidson for the police."

Lucius Davidson testified: "When this trouble came up I was in bed, where I had been for about fifteen minutes, as I retired at about a quarter of nine. I first heard a lot of talking by several people in the hall, and I think I heard one of them say, 'This is the place; I think she is in; there is a piano in there.' There is no piano in there and I did not recognize the voice of the person. My wife and I were there and they knocked on my door and said for me to open it, and I did not open the door but told them I was in bed and couldn't play the piano at that hour, so they left my apartment. I had on my trousers and shoes and had on no underwear, and I looked out after them. I just went to the door and the hall was lighted when I looked out, and I saw Wilbur Carter, Lorenzo Early, Mark Walker and the girl there. Carter was standing in the doorway and had on an overcoat, but I don't know whether it was light or dark. I don't know whether he had on a hat or a cap and he said nothing to me.. I could hear them talking to Adams, who lived west of me on the same floor. Adams told them they better be quiet, and after they talked a little while they went on down the hallway toward the stairs. I recognized four or five of them, including Carter, Lorenzo and the girl, and a dark fellow, and Wilbur Walker, and they were all moving toward the third floor and were going up the stairway. Ware lived on the top floor, and I heard Ware tell them to get out of there with that noise, and some of the gang told him to go in. I couldn't see what happened but they moved closer on him, and someone said, 'Let's get him,' and they all, I couldn't say who they were, ran up there around the back stairs where he was. I heard Ware say, 'Wait a minute.' Then I heard the falling and then I ran down to the office and told Mrs. Wigley, the landlady, about it. While I was talking to her Lorenzo and this fellow came down. They

were talking and he had his hands in his pockets, and I said, 'What are you doing in this building with all that noise?' and he stopped and talked, and I told him to go on out, and he went out the front way and the others all ran out." There were four or five, or possibly more, of the crowd on the third floor where Davidson's room was. Davidson heard Adams tell somebody that he had better be quiet, or something like that. Early went out last. He had his hands in his pockets.

Lucile Brown, who lived on the third floor, testified that she answered a knock at her door. Walker, Carter, McKnight, a girl and some others were there. Walker asked for a Miss Harris, and was told that she lived on the next floor. The mother of the witness pulled her back in the room, where she put on a dress and then went back into the hall. There was much talking—a lot of argument. Ware was on the next floor, where the witness could not see him, but she heard him telling them that no Miss Harris lived there and they should get out. A large, round-shouldered, heavy-set man, taller than the others, who wore a Prince of Wales coat, a Stetson hat and light-colored shoes and had a knife in his hand, said to Ware, "What are you whoofing about up there?" and had an argument with Ware. Carter was not the man who had the knife and the argument with Ware.

Adams heard the noise and went out into the hall. Walker and another man were at the door of Lucile Brown and her mother, Mrs. Adams. Walker was trying to force his way in. Adams had his razor in his hand and took Walker by the shoulder and asked what was the matter. Walker said that he was looking for Miss Harris. Adams then recognized Walker and told him to cut it out and get out. The other fellow had on a Prince of Wales coat, a light hat and was neatly dressed, and said, "Well, you had better keep your shirt on," to which Adams answered, "I will take care of that." Walker said, "I know him; he's

all right." Adams said: "Yes, fellows, I am for peace; come on; get out of the hallway." The other fellow said, "Will you shake it off?" Adams said, "Yes, it's all right with me so long as you get out and cut out the disturbance." The fellow had a knife in his hand and put his hand back of him. Adams had the razor in his right hand and distrusted the other, but put forward his left hand, lightly touched the other's hand and drew his own back. Adams then said, "Well, go on fellows; Miss Harris lives on the third floor; you will find her up there." Walker said, "Come on, fellows; let's go," and they all started toward the stairway. Adams heard a fuss and a rumble on the stairway and turned to "peek" round the corner. He saw the fellow whom he had shaken hands with run down the stairs with a knife in his hand. Adams went back to his room, to which Letitia Wigley came a few minutes later and told him that they had knocked Ware off. Carter was in the crowd but was not the man with the knife. He had on "just common, ordinary, slouchy-looking clothes, like a man who had come from work."

At the police station the same night both Lucile Brown and Adams first identified Carter as the man who had the knife, but upon closer inspection on the same occasion, at the same time and place, Adams stated that he was not the man, and Lucile Brown said she did not know for sure.

Carter was arrested the same night at about eleven o'clock, while eating at a lunch car on Thirty-first street, between Ellis and Cottage Grove avenues, which was four or five blocks from the Douglas Hotel. There were seven or eight others in the place. When asked where he had been, he freely stated the fact that he had been at the Douglas Hotel, where he went to a party, and that he had remained there about five or ten minutes, but refused to admit that he had done any cutting or seen any trouble there. Carter is about five feet eleven inches tall and weighed about 160 or 170 pounds. When he was arrested he had

on a dirty old gray soft hat with a black band, an old over-
coat, which was so dirty that its color was unrecognizable,
and heavy brogan shoes. Under his hat was a woman's
stocking tied at the top to hold his hair down. Carter tes-
tified that he was dressed the same way at the hotel as
when arrested, and that he had on an old dirty black cap,
an old coat and trousers to match, which were dirty and
dusty from baling paper, and a pair of army shoes, but
wore no overcoat.

The evidence was contradictory. Only two witnesses
testified to having seen the actual occurrence, and they tes-
tified that they saw the plaintiff in error cutting Ware.
The plaintiff in error is a large negro, twenty-two years
of age as he testified, and weighed from 160 to 170 pounds.
The witnesses Adams and Lucile Brown, when they first
confronted him that same night at the police station, iden-
tified him as the man who had the knife at the Douglas
Hotel but later concluded that they were mistaken, Mrs.
Brown because she had a side view of the face of the man
who had the knife and he had no scar on that side of the
face, and Adams because the man with the knife was neatly
dressed and had no scar on his face while plaintiff in er-
ror was not neatly dressed and did have a scar. The tes-
timony of Walker and Early was positive. Plaintiff in
error was of their crowd. They were not unintentionally
mistaken. If their testimony was false they knowingly
committed perjury. Mrs. Brown and Adams observed the
crowd and its members under circumstances of consider-
able confusion. Adams, it is true, had a good opportunity
to view the man who carried the knife, under circum-
stances to impress his features and dress upon his memory.
Mrs. Brown had no such opportunity.

It is undoubtedly true that Carter did go to the Doug-
las Hotel and to the fourth floor of the building; that he
resembled a man who had a knife and was seen there by
two disinterested witnesses; that he was in a position, as

were several of the crowd, including Walker and Early, to have committed the murder; that he had had, as he testified, a drink of whiskey from the gallon jug which Walker carried, and that there is no evidence discrediting the testimony of Walker and Early except the circumstances of their position, which of itself cast suspicion upon them, and the contradiction by the plaintiff in error and McKnight of Walker and Early's testimony that the plaintiff in error gave the knife to McKnight and wiped his bloody hands on a handkerchief. The plaintiff in error frankly admitted, immediately upon his arrest, that he was at the Douglas Hotel at the time of the trouble but then and always denied that he was guilty of the murder. Either the plaintiff in error and McKnight or Walker and Early knowingly testified falsely. The interest of Walker and Early to testify falsely may have been as great as that of the plaintiff in error, for if the plaintiff in error did not kill Ware, Walker and Early may have done so. Walker had once lived at the hotel but had been put out by the owner. The plaintiff in error offered to show that Walker was a habitual trouble maker, but no offer was made to show what the trouble was or what he did to make trouble, and the offer was rejected.

No other error is argued than the failure of the evidence to exclude all reasonable doubt of the guilt of the plaintiff in error. The case depended upon the credibility of the witnesses. The plaintiff in error was poorly represented on his trial in the criminal court, and the scanty brief presented on his behalf in this court has been of little assistance in the investigation of the case. Walker testified on re-direct examination, as shown by the abstract: "Before I testified, Carter wrote me a letter. He didn't write it to me but he wrote it to a lady by the name of Miss Perry, at 3021 Cottage Grove, and told me what not to testify to. The name Carter was signed to the letter but I don't know his handwriting, and it was written in lead

pencil. I don't know when the letter was written or what month it was written in, but this lady showed me the letter when I went down to her house to get my laundry." It appears from the record that plaintiff in error interposed the objection: "I object to this. He is seeking to introduce in evidence the contents of a letter that Carter wrote to some other lady." The court did not rule upon the objection, but questions were asked in an effort to learn whether the letter still existed and whether the writing was that of the plaintiff in error, but neither matter was learned and the subject was dropped. No ruling was made. There was no motion to strike the testimony and no instruction was given to the jury to disregard it. It was therefore left to the jury for their consideration, and it permitted the jury to believe that the plaintiff in error had, in fact, written a letter seeking to direct and control the testimony of a witness. If he had done that, the jury might have decided from that fact alone that he would also just as readily commit perjury. The critical question in the case being the credibility of the witnesses, this testimony went to the core of that question. The life of the plaintiff in error was in the balance, and the weight of so highly prejudicial, incompetent evidence ought not to have been thrown into the scale against him. In so evenly balanced a case this incompetent evidence may well have controlled the judgment of the jury in regard to the relative weight to be accorded to the testimony of the various witnesses. If this testimony were accepted as true the jury might well regard the plaintiff in error as completely discredited. It is impossible to say that the jury did not regard this testimony as the determining factor in deciding the question of the guilt of plaintiff in error and in fixing his punishment at death. It is not the duty of the State's attorney to endeavor to procure the conviction of a defendant charged with a crime by the introduction of incompetent evidence, and the court ought not to let a verdict stand

which has been procured by such evidence. Here the objection was made, but the court neither sustained nor overruled the objection. The testimony, however, remained before the jury. No instruction was asked or given to disregard it, but in a capital case we cannot affirm a judgment of conviction where such prejudicial error, though not properly preserved for review, appears in the record and where sharply conflicting evidence is so nearly equally balanced. The ends of justice require that the cause should be submitted to another jury.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*