(No. 19958.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK GEIDRAS, Plaintiff in Error.

*Opinion filed February 21, 1930.*

JOHN F. CASHEN, JR., for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (ED-WARD E. WILSON, and JOHN HOLMAN, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Frank Geidras, Mike Smolenski, Peter Levon and Paul Murales were indicted in the criminal court of Cook county for robbery while armed with a pistol. On the trial, at the close of the evidence for the prosecution, the State's attorney entered a *nolle* as to Levon and Murales. Geidras and Smolenski were found guilty. Geidras was found to be eighteen years of age. He was sentenced to imprisonment in the penitentiary at Joliet and has sued out a writ of error.

The robbery occurred at the shoe store of Harry Poticha, 3435 South Halsted street, in Chicago, about eleven o'clock at night on Thursday, October 11, 1928. Poticha testified that he was in the back part of the store, alone, working on his books, when the plaintiff in error walked in. He sat down and Poticha was taking his shoe off when another young man (Smolenski) came in. Poticha spoke to this young man and asked if they were together, and he said they were. Poticha was trying to fit Geidras with a pair of shoes. Smolenski displayed a revolver and told him to walk to the back of the store quick and asked where his money was. Poticha told him that it was in his pocket and in the cash register. Smolenski took the money that was in Poticha's pocket and a Masonic ring and Geidras took the money from the cash register. Poticha's watch,

which was lying on the cash register, was also taken. The money and a check which was taken amounted to $469 and were the receipts of the store for that day and the two preceding days. The Masonic ring was worth about $75 and the watch about $25. Poticha did not know the men who robbed him, but on the following Monday he was called to the police station, where he identified Geidras and Smolenski as the robbers from among six or seven more men who were lined up for his inspection. Poticha then told Smolenski that he was at the window twice before he walked into his store, and Smolenski said he was, and Poticha asked him what kind of a gun he had, and he said a .32 nickel-plated revolver. Poticha asked him what he did with the watch and ring, and he said he had sold them to a burglar down-town. Fred J. Querin, a police officer who was present on this occasion, testified in substance corroborating the testimony of Poticha as to what occurred there.

Both Smolenski and the plaintiff in error denied having anything to do with the robbery. Smolenski testified that he knew Geidras only by sight and on the night of the robbery was working all night at his usual place of employment, about a mile from the place of the robbery.

The identification of the plaintiff in error as one of the robbers rests entirely upon the testimony of Poticha. The statements of Smolenski at the police station did not implicate Geidras, and while Poticha testified that he picked out Geidras at the station as one of the robbers, he also stated that he did not talk with him. The evidence was conflicting and so close that any error occurring on the trial against the defendant was necessarily prejudicial to him. He had a right to a trial in which the presumption of his innocence should be observed throughout the trial, and he should not be deprived of it by innuendo not based on any evidence properly admitted against him. The defendants were represented at the trial by different coun-

sel, the plaintiff in error's counsel being appointed by the court. After the prosecution closed its case, which consisted of the testimony of Poticha and the police officer Querin, Leo Moch, the first witness called for the defendants, testified to facts in support of Smolenski's alibi. Smolenski testified that he just knew Geidras by seeing him, that he never had a gun in his life, that he was not with Geidras at various times and places which he was asked about, that he had nothing to do with the robbery, and then testified to the fact that he was working all of the night of its commission at his usual employment. Two witnesses also testified in support of Smolenski's alibi.

The plaintiff in error testified in his own behalf but upon his examination in chief was not asked whether or not he knew Smolenski or had ever owned or possessed a gun, and he did not testify in regard to either of these questions. On cross-examination he was asked, "Do you know Mike Smolenski?" and answered, "I know him to see him." He was then asked, "Did you ever go with him anywhere?" and answered, "No, sir." The following questions were then put to him, and he was required, over his objection, to answer them: "Did you ever go with him quite often to a pool-room at Thirty-third and Morgan known as White Sox Pool-Room?" "You were there together in that pool-room often?" "Did you ever have a gun?" "Did you ever go into a beverage place at 1701 South Racine, and did you have a gun?" "Did Mike Smolenski have a gun at that time?" "Did you ever see a man sitting near that police officer, Mr. Dunn?" "Were you ever at Mr. Dunn's place of business at 4550 South Ashland avenue?" To all these questions he answered "no." He was then asked, "And didn't Mike Smolenski have a gun at that time?" to which the court sustained an objection in this language: "Sustained, as far as Mike Smolenski is concerned." In rebuttal, Morris Dunn, who was a retail clothing merchant, testified, over the defend-

ants' objection, that on January 9, 1928, the plaintiff in error and Smolenski, each having a gun, were in his place of business at 4550 South Ashland avenue about three o'clock in the afternoon. On cross-examination he testified that about October 14 or 15, 1928, not having seen either of them in the nine months intervening, he was called to the police station to identify them but was unable to do so. He was later called to the station again and the police told him that they did it. Thereupon, on motion of the plaintiff in error, Dunn's evidence was stricken and the jury were instructed to disregard it. The plaintiff in error's counsel then asked that a juror be withdrawn and the cause continued, but the motion was denied. The manifest intention and effect of the cross-examination of the plaintiff in error and the rebuttal testimony of Dunn was to induce the jurors to believe that Geidras and Smolenski attempted to rob Dunn in his store and to impress them with the belief that Smolenski and the plaintiff in error were well acquainted and had been engaged in other robberies.

The cross-examination of the plaintiff in error as to his possession of a gun and relation to Smolenski was improper, because he had not been asked or testified about those matters in his testimony in chief. Cross-examination of a witness should be confined to matters brought out upon his direct examination. (*People* v. *Newman*, 261 Ill. 11; *People* v. *King*, 276 id. 138.) The prejudicial effect of the improper cross-examination of the plaintiff in error permitted by the court was intensified by the testimony of Dunn. Though his testimony was afterwards excluded, yet the harmful effect intended by its presentation to the jury had been accomplished and was irreparable. The motion to withdraw a juror ought to have been allowed. The jurors had heard the sworn testimony of the witness and the court could not by an instruction erase it from their minds. It is at least doubtful whether the jurors could

escape its effect in their consideration of the evidence. In so close a case it may have been the turning point of the verdict.

The judgment of the criminal court is reversed and the cause remanded. *Reversed and remanded.*