(No. 22037.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDD BREWER, Plaintiff in Error.

*Opinion filed February 23, 1934.*

CHARLES T. FLOTA, and ROBERT E. SMITH, for plaintiff in error.

OTTO KERNER, Attorney General, JOHN R. KANE, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

The defendant, Edd Brewer, was convicted at the December term, 1932, of the Saline county circuit court for the murder of Grady Sutton and was sentenced to death. He had previously been convicted of the murder of Danny Law, for which offense he was sentenced to imprisonment in the penitentiary for life. We will refrain from discussing the facts surrounding the killing of Law except so far as they are necessary in dealing with the killing of Sutton. The record on the charge for the murder of Sutton is before us on writ of error.

The defendant is a native of Kentucky and has been employed as a farmer and coal miner. About seven or eight months prior to the homicides he came to Williamson county, Illinois, and went to work for Joel Rich, husband of defendant's sister. Some time in May, 1932, he returned to his home in Kentucky for a visit. He went on a train and came back in an automobile with Neal McGinley, a co-defendant on the trial. They had worked together in the coal fields. The automobile ·in which the men returned belonged to McGinley. A third man involved in the homicides was Wesley Sheward, whose home was in

Oklahoma. He and Brewer were acquaintances and there was a marriage relation between some of their relatives. It is not clear from the abstract and briefs whether Sheward came to Illinois at the time Brewer and McGinley did or not. At any rate he went to the home of Joel Rich, near Herrin, and he, Brewer and McGinley stayed there the night of June 30. The next day they left Rich's home for Eldorado in a Chevrolet coupe claimed by Sheward. When they reached that city McGinley and Sheward stopped to see Tip Clark, McGinley's uncle, and defendant drove the car to call on one of his friends named Pinnell. While Brewer was away on this occasion his two friends went to a notary public and caused a bill of sale for the Chevrolet coupe to be executed by McGinley, under the name of Williams, to Sheward. It was not shown that Brewer knew anything of this transaction. In fact, the evidence strongly indicates that he did not know of any intention to execute the bill of sale, or that it had been executed, until later in the day, when officers asked for it. Early that evening, Brewer, McGinley and Sheward left Eldorado on their return to the home of Rich. McGinley was the driver of the coupe. Brewer sat in the middle and Sheward on the right side. When they reached Harrisburg they stopped at Leitch's filling station for gasoline. Brewer remained in the car. McGinley and Sheward got out. McGinley checked the oil and got a drink of water. Sheward walked about the premises until the car was ready to leave. While they were at this filling station, John Choisser, a brother of the sheriff of Saline county, was also obtaining gasoline there. The coupe had only one Oklahoma license plate on it. Choisser testified he was noticing cars to see if they were properly equipped with license plates. It appears that the Oklahoma law requires only one plate to be exhibited. Choisser evidently did not know that fact, for he proceeded to the county jail, where he found one of his brothers, who was a deputy sheriff, and

told him of the license plate and the three men in the coupe. Standing near by at the time were Grady Sutton and Ivan Green, highway patrolmen, in uniform. The deputy sheriff told them what his younger brother had said. Just then the Chevrolet coupe approached and passed them. Choisser and the patrolmen got in a car and drove after the coupe, commanding it to stop. Sheward heard the command and told McGinley of it. The car was pulled near the right curb and stopped. The patrolmen came to the left-hand side of the car and Choisser to the right. Presently Danny Law, chief of police of Harrisburg, arrived. He had on no uniform but was dressed in a white suit of clothes. One of the patrolmen asked the men in the coupe, "Where are you going?" Sheward replied, "Herrin." The officer said, "Where is your bill of sale for this car?" Sheward took from his pocket the bill of sale which had been executed in Eldorado, reached in front of the other two occupants of the car and handed it to Sutton. Different versions were given as to what Sutton said after he had examined the instrument, but it is agreed that he directed the occupants of the coupe to drive to the police station. Sutton got on the left running-board and Law on the right running-board. McGinley started the car and Sutton directed its course. When it reached a point near the police station two shots were fired in rapid succession from within the car. One of them pierced the body of Sutton, who fell from the running-board. He was able to get to a grass plot but soon died. A bullet struck Law but did not incapacitate him. He flinched and worked his way back on the running-board until he got to the rear of the car. A number of shots were fired. Law was finally killed and dropped from the automobile. During the battle McGinley speeded up the car. When it had gone a few blocks Brewer remarked, "Sheward is gone," meaning he was dead. The coupe was driven to a country church, where it and Sheward's body were abandoned. Both Brewer and

McGinley fled and were later captured in distant States. They were jointly indicted for the murder of Sutton. The jury found them guilty and fixed the penalty at death. The court granted McGinley a new trial. He afterwards pleaded guilty and was sentenced to the penitentiary for life. Motions by Brewer for a new trial and in arrest of judgment were overruled and judgment was entered against him on the verdict.

So far as the record in this case discloses, the defendant,. Brewer, was not guilty of any crime or charged with any crime prior to the time the coupe was stopped by the officers. Diligent efforts were made by the prosecution to prove he had been connected with certain crimes. These efforts were made for two reasons. The first was to justify the arrest made by the officers in front of the jail, and the second was to show that the motive for the killing was to avoid arrest on account of such crimes. Warrants had been issued in the State of Kentucky against Sheward and McGinley, but there is no competent evidence showing that any criminal charge had ever been made against Brewer in that State. When he was on the witness stand an assistant State's attorney asked, "Hadn't you, about four or five days before that, [the date of the killing,] held up a man out there by Joel Rich's, where you were staying?" The court sustained an objection to this question, but the effort to connect Brewer with the alleged crime was continued throughout the case. Brewer was not only asked about it repeatedly, but .McGinley was asked if he had not told certain officers that he, Brewer and Sheward had held up an old man who lived four or five miles from Rich's place. Both defendants objected to the questions. The court overruled the objections with a remark that "any statement that was made in connection with either person would be proper only for the purpose of impeachment, and that is all it is being admitted for." There are several valid objections to the question. In the first place, it would

not afford the proper method of showing the existence of a criminal charge against either of the defendants. (*People* v. *King*, 276 Ill. 138; *People* v. *Decker*, 310 id. 234.) Again, it is the occasional exception that proof of other crimes not connected with the particular crime charged can be shown against a defendant. (*Farris* v. *People*, 129 Ill. 521; *People* v. *Swift*, 319 id. 359.) The general rule is that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it is a crime of the same sort, is irrelevant and inadmissible. The rule extends to proof of an accusation of another crime as well as to evidence of its actual commission. (16 Corpus Juris, "Criminal Law," 587.) But more important is the transgression of the constitutional rights of a defendant in attempting to compel him to give evidence against himself as to the commission of crime. (Const. art. 2, sec. 10.) It is true that here the objection made was based on the ground that the question was asked for the purpose of prejudicing the jury, still, in a case of this kind, where men are being tried for a capital offense, an error of this moment ought not be excused on the technical ground that the objection was not broad enough. *People* v. *Carter*, 327 Ill. 223.

McGinley was asked numerous questions concerning admissions alleged to have been made by him which directly imputed guilt to Brewer. On occasions the court would caution the jury that the answer of the witness was not binding upon Brewer because made out of his presence; on other occasions no such admonition was given. One instance of the latter nature pertains to evidence which was manifestly dangerous and prejudicial. On cross-examination McGinley was asked: "I'll ask you if, only a few days ago, while coming from Benton to Harrisburg and while on the road from Benton to Harrisburg, you didn't

tell Murray Stinson that after you turned off the square down toward the police station that Brewer there said, 'What shall we do, boys?' and Sheward answered, 'Shoot them off.'" The witness answered, "I don't think so; no sir." The attorney for Brewer said, "We object to the answer and move that it be stricken because the conversation was had without the defendant Brewer and not in his presence and is no evidence against the defendant Edd Brewer." The court remarked, "He is a witness now and it is not a confession. Overruled." Although the answer was in the negative, the question contained a direct imputation of concerted action on the part of Brewer and Sheward to kill the police officers. It does not matter that the answer of McGinley was in the negative. The attorney for the State probably expected an affirmative answer, and the court should have warned the jury in advance that neither the question nor the answer should prejudice Brewer. The objection was overruled on the ground that the question was proper because McGinley had taken the witness stand for himself.

The court was asked to caution the jury to disregard People's exhibit "1" as against Brewer. The exhibit was the bill of sale. The court replied, " I don't know what the evidence will show as far as Brewer is concerned; go ahead." There is no doubt that there was something spurious about the bill of sale, but the guilty parties connected with it were McGinley and Sheward, and not Brewer. It had no place in the evidence as against him.

On his examination in chief Brewer was asked if prior to the time of the homicides he had ever wrongfully done anything to anybody or had attempted to do anything to anybody. This question was propounded to him for the purpose of showing that there was no reasonable ground for his arrest. It was entirely proper. The prosecution objected, however, and the court stated, "If there is anything he expected to be arrested for he may state it." Coun-

sel for Brewer naturally took exception to that statement of the court. We can see no ground whatever for the court's suggesting to Brewer that he might state voluntarily whether or not he was expecting to be arrested for some crime. He had a right to deny guilt, but he should not have been invited by the court to state whether or not he was expecting to be arrested.

McGinley testified he did not know who reached in front of him to fire the fatal shot against Sutton. Murray Stinson was produced as a witness in rebuttal and was asked if McGinley did not tell him that he knew positively it was Brewer. The court overruled an objection to the question and the witness answered, "Yes, sir." The attorney for the prosecution then repeated the question. Another objection was overruled, and the court replied that the objection had already been ruled on and that the question was only for the purpose of impeaching the witness. No other limitation was made as to the effect of the answer. The conversation referred to in the question was not in Brewer's presence, and it is obvious that the answer, without an admonition from the court that it should not be considered against Brewer, was improper and prejudicial.

Brewer denied he shot Sutton, and testified that Sheward, without saying a word to anyone, extended his arm in front of the other two occupants of the car, shot Sutton, and then immediately turned his gun on Law, wounding him; that he (Brewer) was struck by something in the back of the neck which dazed him for a time and that he was wounded in the arm by a bullet. None of this testimony is denied. The only competent evidence tending to contradict it is a statement of the witness Harmer W. Smith, who testified that he is a penitentiary guard at Chester. He was asked whether or not Brewer made a statement to him as to who killed Sutton. He answered, "He told me he did the killing of both of these men." The direct examination of this witness was very brief and does

not indicate any plausible reason for the alleged admission. There was little acquaintanceship between the men. Smith stated he asked the prisoner if his name was Brewer and if he was in the killing at Harrisburg, and Brewer replied he killed both of the men. There are circumstances in the record not necessary to set out which greatly discredit the testimony of Smith. But aside from that, his story is improbable and of doubtful credibility.

The People's witness Joel Rich testified Sheward had told him there were eleven indictments against him in Kentucky and that he never intended to be taken alive. The record discloses both motive and intention on behalf of Sheward to kill, if necessary, those who would attempt his arrest. The record shows ample reasons why Sheward and McGinley would want to avoid arrest and that such reasons to desperate men might afford a motive for murder, but no such reasons appear against Brewer. If the testimony which should have been restricted to McGinley alone were not in the record there would remain practically no evidence to support a charge against Brewer for the murder of Sutton. There was no evidence, direct or circumstantial, tending to show a general plan or scheme between Brewer and the other occupants of the coupe to commit any crime. There was no competent evidence to show that Brewer ever joined Sheward and McGinley, or either of them, in the perpetration of an unlawful act. There was an utter lack of motive on his part to kill Sutton and there was no substantial evidence to show that he did kill him. The State's attorney proceeded in the trial on the theory that it was McGinley, and not Brewer, who killed Sutton. While examining a witness by the name of Lacefield an objection was made to one of the questions, whereupon the State's attorney stated to the court: "What we are offering to show by this witness is the motive he [McGinley] had for wanting to get away from the officers here. We offer to prove by this witness that he got on the car with

defendant Neal McGinley and advised him that he had a warrant for his arrest, and he did just as he did in this case—he speeded up his car to fifty or sixty miles an hour, pulled his revolver and knocked him off his car."

The case attempted to be made against Brewer was, that he, Sheward and McGinley were criminal characters; that they were car thieves; that they were accused of various crimes; that they were fugitives from justice, and that at the time of their arrest in Harrisburg they were in possession of a stolen car. There was much evidence to prove those charges against Sheward and McGinley but the record as it stands fails to prove them against Brewer. The contention that the officers had been asked to be on the lookout for "three boys" and that the arrest was made for "speeding" cannot be taken seriously. The evidence conclusively shows they were stopped because John Choisser reported to his brother that three men were in a Chevrolet coupe which had only one Oklahoma license plate on it, and that they were arrested on suspicion of being automobile thieves.

We have examined the record, and while it contains evidence that Sheward and McGinley had committed and were accused of other crimes, there is no evidence which fairly tends to prove that Brewer had committed or was charged with any criminal offense prior to the homicides. Arrests upon bare suspicion are not permitted under the law. *People* v. *McGurn,* 341 Ill. 632.

Instructions were given on behalf of the People concerning the right of an officer to make an arrest without a warrant. There was not the semblance of a right for the officers to arrest Brewer in Harrisburg. Such instructions should not have been given as far as he is concerned. The instructions upon conspiracy should not have been given, as the evidence afforded no basis for them as against Brewer.

Affidavits of jurors were filed showing flagrant misconduct of jurors, revelations to the public of the votes

taken upon the question of conviction, telephone conversations in the presence of the jury concerning their deliberations, opportunity of outsiders to communicate with jurors, and efforts of jurors to be selected on the panel. These affidavits, of course, cannot be heard to impeach the verdict of the jury, but the whole course of the trial was not consistent with the orderly procedure which should be observed where a man's liberty or life is at stake. The verdict against Brewer is contrary to the manifest weight of the evidence.

For the errors pointed out, the judgment of conviction must be reversed and the cause remanded to the circuit court of Saline county.    *Reversed and remanded.*