Michael Raucci, Appellant, v. Thomas E. Connelly and William J. Drury, Appellees.

Gen. No. 44,702.

Opinion filed February 21, 1950. Released for publication March 15, 1950.

BERNARD J. McDONNELL, of Chicago, for appellant.

CLARENCE M. DUNAGAN, of Chicago, for appellees.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Michael Raucci filed a complaint against Thomas E. Connelly and William J. Drury. Count I alleged that Thomas E. Connelly was a Captain of Police and William J. Drury, a Lieutenant of Police of the City of Chicago; that on November 23, 1946, in Chicago, Cook county, Illinois, they, without any reasonable or probable cause therefor, and without any warrant or other process for his arrest, arrested plaintiff and compelled him to go in a certain police car along the streets of said city and falsely and wrongfully detained him in a cell in a certain police station of said city from

November 23, 1946, until approximately 6 o'clock P.M., November 24, 1946, contrary to the laws of this State and against the will of plaintiff; that said acts of defendants against plaintiff were committed wickedly, falsely, maliciously, wilfully and wantonly, and without any reasonable or probable cause or justification therefor, and that malice is the gist of this action. Count II alleged that defendant Drury, on or about November 25, 1946, with the advice, consent and direction of defendant Connelly, went before William V. Daly, one of the associate judges of the Municipal Court of said city, and charged plaintiff with having violated Chapter 193, Section 1, of the Revised Code of the City of Chicago as amended, thereby charging that plaintiff on November 23, 1946, made an improper noise, riot, disturbance, breach of the peace, or diversion tending to the breach of peace, and charged plaintiff with being guilty of said offense and then and there filed a written complaint, signed and sworn to by defendant Drury, with the advice, consent and direction of defendant Connelly, charging plaintiff with such offense, which complaint was thereupon filed in said court; that the said judge, having heard and considered all that defendants could say or allege against plaintiff touching or concerning said supposed offense, adjudged and determined that plaintiff was not guilty of said supposed offense, and thereupon caused plaintiff to be discharged out of custody, fully acquitted and discharged of the said supposed offense; that defendants have not further prosecuted said complaint, but have jointly and severally abandoned the same, and the said complaint and prosecution are wholly ended and determined. Each of the counts alleged "that the plaintiff is a good and honest citizen of this state, and of the City of Chicago and County of Cook, and up until the time of the committing of the several grievances by the defendants as hereinafter mentioned, deservedly obtained the good opinion

and credit of all his neighbors and other worthy citizens of this state.'' After issue joined the cause was submitted to a jury and a verdict was returned finding defendants not guilty. Plaintiff appeals from a judgment entered upon the verdict.

Plaintiff raises and argues many points in support of his contention that the judgment should be reversed. The following are the more important ones:

''9. The Court erred in permitting the defendants in their opening statement over objection of the plaintiff to read from a document concerning various arrests of the plaintiff prior and subsequent to his arrest in the case at bar.

''10. The Court erred in overruling plaintiff's several motions to withdraw a juror and declare a mistrial.

''11. The Court erred in permitting the defendants in their opening statement over the objection of the plaintiff to make improper, inflammatory and prejudicial statements.

''12. The Court erred in admitting over the objection of the plaintiff incompetent, irrelevant and immaterial evidence.

''13. There is no competent evidence in the record tending to support the defendants' defense.

''14. The Court violated the plaintiff's right to a fair and impartial trial.

''15. The Court erred in overruling plaintiff's objection to improper, incompetent, irrelevant, and prejudicial evidence offered by the defendants.

''16. The Court made improper and prejudicial remarks and statements in the presence of the jury.

''17. The Court erred in allowing defendants' counsel to conduct an improper cross-examination of the plaintiff and his witnesses over the objection of the plaintiff.

''18. The defendants, by their counsel, made unjustifiable and prejudicial remarks in the presence of the

jury during the taking of the evidence and in their final argument.''

After a careful study of the record we are satisfied that plaintiff did not receive a fair and impartial trial. Counsel for defendants in his zeal to obtain a verdict in their favor appears to have ignored errors committed in bringing about the desired verdict.

Plaintiff was associated with the Seneca Printing Company, publishers of the Daily Turf Observer and the Weekly Turf Observer. These publications were known as handicap sheets, used in connection with horse races, and were sold publicly on news stands and in hotel lobbies. Plaintiff was a distributor of the Observer in the loop district of Chicago and it was his custom to procure his allotted share of the publication in the morning and to return the unsold copies and make his accounting in the afternoon. On Saturday morning, November 23, 1946, between 9:30 and 10:00, plaintiff followed his usual custom of picking up his papers and selling them. About 1 o'clock p.m. he returned to the office of the Seneca Printing Company, located at 106 East Hubbard street, for the purpose of an accounting, and saw defendants on the fourth floor of the premises of the Printing Company. Connelly was a Captain of Police and Drury, a Lieutenant of Police. After some conversation between plaintiff and defendants plaintiff was taken into custody by the officers, who did not have a warrant or any other process for his arrest. Plaintiff was then placed in a police automobile and driven to the Detective Bureau, located in the 1100 block of South State street. He arrived there about 2 o'clock and was held in a cell, incommunicado, from that time continuously until approximately 5 o'clock Sunday afternoon. During the time that he was confined he was photographed, fingerprinted, and forced to exhibit himself in a ''show-up'' of prisoners. In the ''show-up'' plaintiff was placed

on a stage under lights and exhibited to persons who had been victims of criminal acts. No one identified him in connection with any crime or misdemeanor. No complaint was filed by either of the defendants against plaintiff, but after the "show-up" he was "booked" on a charge of disorderly conduct. From the time of his arrest until he was "booked" he was in custody, allowed no freedom of motion, and could not be released on bail. Shortly after 5 o'clock Sunday afternoon plaintiff was released on a cash bond. On the morning of November 25 defendant Drury, with the consent and approval of defendant Connelly, swore to an information in the Municipal Court charging plaintiff with "disorderly conduct" in that on November 23, 1946, he "did make or aid in making an improper noise, riot, disturbance, breach of the peace, or diversion tending to a breach of the peace within the limits of the City of Chicago." The case was called for hearing before a judge of the Municipal Court, at which time plaintiff, his attorney, and both defendants were present. At the hearing defendant Drury was asked by counsel for plaintiff if he had signed the complaint, to which question Drury answered that he had. He was then asked, "Did the defendant make or aid in the making of any improper noise, riot or disturbance?" to which defendant Drury answered, "He did not." At the conclusion of the hearing plaintiff was discharged. During the trial of the instant case, when defendant Connelly was upon the stand, the following occurred: "Q. Prior to the time you placed him under arrest did he make any noise? A. He was evasive. He did not want to even talk to us. Q. Did he make any noise? A. Well, he raised his voice." Upon the trial of this case counsel for plaintiff contended with considerable force that under the admitted facts defendants failed, as a matter of law, to justify the arrest, detention and prosecution of plaintiff. Counsel for de-

285

fendants sensed the situation and realized, apparently, that the charge of disorderly conduct (raising his voice), especially in view of defendant Drury's statement at the time of the hearing before the Municipal Court, would not justify the arrest, imprisonment and treatment that plaintiff received, and attempted to set up a new ground in justification of the arrest and detention. He called defendant Drury to the stand, and the following occurred: "Q. State your name, please. A. William J. Drury. . . . Q. Calling your attention to November 23, 1946 did you in company with Thomas Connelly arrest Michael Raucci? A. I did. Q. Where did you arrest him? A. 106 East Hubbard Street. Q. *What was the occasion for that arrest? A. We arrested him as a suspect in the murder of James Ragen.* . . . Mr. McDonnell [attorney for plaintiff]: I am making the same objection here for the reason that the complaint alleges a charge here that was placed against the defendant, and later this plaintiff, and that's the only matter before this jury, and that's the charge which the defendants must meet and they must justify. The Court: *The defendants have a right to offer such evidence as they see fit to justify the arrest and that is what they are doing now.*" The contention of plaintiff that the admission of the testimony of Officer Drury that "we arrested him as a suspect in the murder of James Ragen," especially in the light of the language used by the court in ruling upon plaintiff's objection, constituted reversible error, is fully warranted. In reaching that conclusion it was not necessary for us to consider the point raised by plaintiff that defendants were called upon to justify the arrest of plaintiff upon the disorderly conduct charge. A police officer, "*when a criminal offense has in fact been committed* and he has reasonable ground for believing that the person to be arrested has committed it," may make an arrest, but to justify the arrest his belief that the person to be

arrested is guilty of the crime must be such as would influence the conduct of a cautious and prudent man under the circumstances. (*People v. Scalisi,* 324 Ill. 131, 146, 147.) "Arrests upon bare suspicion are not permitted under the law. *People v. McGurn,* 341 Ill. 632." (*People v. Brewer,* 355 Ill. 348, 357.) In the instant case there is no competent evidence to show that James Ragen was, in fact, murdered, and there is nothing in the record that would justify defendants, acting as prudent and cautious men, in believing that plaintiff had committed the supposed murder of Ragen. Indeed, defendant Drury testified that "we arrested him *as a suspect* in the murder of James Ragen." From the language used by the trial court in overruling the objection to the testimony the jury might well assume that the court was ruling that the arrest of plaintiff as a suspect in the murder of James Ragen justified the arrest of plaintiff.

 Plaintiff contends that counsel for defendants, in his opening statement to the jury, committed gross prejudicial error. The counsel told the jury that he intended to show that "on June 29, 1927 Raucci was arrested on a charge of entering the house of a woman by the name of Mabel Whitner in Oak Park and stole her purse containing $22." Counsel for plaintiff objected to the statement and the following then occurred: "Mr. McDonnell: I am going to object to this, may it please the Court, and I would like to have the jury excused to argue the question. The Court: You charge he is a man of good repute. They have a right to show that he is not. Mr. McDonnell: Goes to the question of damages and unless there is evidence of reputation—The Court: Proceed with your opening statement. Mr. Dunagan [attorney for defendants]: I further expect to show that on June 29, 1927 he was arrested on a charge of entering the house of a woman who lived in Oak Park, a woman by the name of Mabel Whitner and stole her purse containing twenty-two

dollars. Mr. McDonnell: I object to this. The Court: Your allegation he is a man of good reputation. Mr. McDonnell: It only goes to the aggravation of damages. The Court: When you get to the matter of value—Mr. McDonnell: May I argue to the Court? The Court: Go ahead with your opening statement.'' Thereupon counsel for defendants continued: ''On April 17, 1930 he was arrested by Sergeant Hankey; on September 19, 1931, he was arrested by Officers Finn, Vavra, Cunningham and Taylor on charge of larceny; on September 10, 1944 he was arrested by Officers Carpenter and Kamerer; on August 5, 1935, he was arrested by Officer Fried; on May 22, 1936, he was arrested by Officers Pacelli, Whalen and De Peano on complaint of Louis Simon on charge of malicious mischief; on April 18, 1943, he was arrested by Officers Schoner and McDonagh for operating a handbook; on August 30, 1945, by Officers Begley, McMahon, Lindstrom, Wright and Shine for operating a gambling house; on January 3, 1946, by Officers Meehan, Dalton and Vasicek on charge of gambling; on January 7, 1946 he was arrested by Officers Conway and Fuller on a disorderly conduct charge; on September 9, 1946 he was arrested by Officers Hight and Ford on assault and battery charge; on August 2, 1946 he was arrested by Officers King, O'Hara, and Mannigan of the robbery detail—and that he has a law suit pending against these officers. . . . Michael Raucci was arrested May 21st by Officers Hensen and Spain as a patron of a gambling house; Michael Raucci was arrested on August 18, 1947 by Officers Moss and O'Hara; that on January 2, 1948 he was arrested by Sergeants Pape and O'Hare of the Detective Robbery Detail; the plaintiff was arrested on December 23, 1947 by Officers Cooper, Hartmann and Allison.'' At this point counsel for plaintiff moved the court to withdraw a juror and to declare a mistrial, which motion was overruled. Counsel for defendants further stated to the jury:

288

"We expect further to show by the evidence of the defendants here that Michael Raucci was reputedly and publicized as a two bit hoodlum." The following then occurred: "Mr. McDonnell: I object to that and move to strike it. Mr. Dunagan: I am quoting—The Court: If he can prove that, *that goes to your allegation that he is a man of good reputation and good repute. You can't in one breath say he has good repute and a good reputation and the defendants have no right to meet it. They have a right to meet that.* Mr. McDonnell: *May I argue that point of law?* The Court: *No.* This is the opening statement to the jury, and unless that can be proved by the evidence, the Court will rule on it at the proper time." At the close of defendants' opening statement counsel for plaintiff again made a motion to withdraw a juror and declare a mistrial, which motion was overruled. Plaintiff offered no evidence as to his reputation, nor was it essential to his right of recovery that he prove the allegations of the complaint as to his reputation. *A fortiori, even if plaintiff had introduced evidence that his general reputation as an honest and law-abiding citizen was good, defendants could only rebut that evidence by testimony to the effect that plaintiff's reputation as an honest, law-abiding citizen was bad.* In *People v. Wilson,* 400 Ill. 461, 479, the court states:

"The law is clear that particular acts of misconduct are not admissible in rebuttal of proof of defendant's good character. (*McCarty v. People,* 51 Ill. 231; *Addison v. People,* 193 Ill. 405.) Notwithstanding the court sustained the objection, the fact remains that his reputation as a good citizen was questioned by insinuations in the presence of the jury, through improper questions of the assistant State's Attorney. In *People v. Lewis,* 313 Ill. 312, a similar question arose. We there said: 'Many questions asked plaintiffs in error and their witnesses on cross-examination had no tendency to prove their guilt of the crime

charged, but *the only tendency was to prejudice plaintiffs in error with the jury and influence them to return a verdict of guilty on general principles. The State must have known it was not competent to ask plaintiffs in error or witnesses if they had not been indicted for other crimes, or the many other questions, . . . which had no tendency to prove the issue being tried. The only effect of such an examination would be to cause the jury to believe plaintiffs in error were bad men and likely to commit such a crime as the indictment charged.'* '' (Italics ours.)

■ The foregoing ruling is applicable to the question before us. Entirely aside from the fact that plaintiff offered no proof as to his reputation, the position of defendants and the trial court that the fact that plaintiff had been arrested a number of times tended to prove that his reputation as an honest, law-abiding citizen was bad, is unsound.

■■ Plaintiff justly complains that the trial court permitted an improper and prejudicial cross-examination of plaintiff and that the cross-examination was not confined to matters brought out upon the direct examination. ''Cross-examination of a witness should be confined to matters brought out upon his direct examination. (*People v. Newman,* 261 Ill. 11; *People v. King,* 276 id. 138.)'' (*People v. Geidras,* 338 Ill. 340, 344.) During the cross-examination of plaintiff it appeared that counsel for defendants lined up a number of detectives, and the following occurred: ''Mr. Dunagan: Q. Well, take a look at these detectives on this side of the courtroom, and see if you can recognize any of them. A. Yes I do. Q. Do you see them? A. Yes, sir. Q. You recognize all those policemen there, don't you? A. Several of them. Q. How many of them do you recognize? A. They are from my district where I live. I see them—The Court: Q. How many of them do you recognize? Mr. Dunagan: Q. How many of them do you recognize? A. There is about

290

six there that I recognize. The Court: All right. The Witness: About six: The Court: About six." Plaintiff was then cross-examined as to purported arrests by officers Begley, McMahon, Lindstrom, Wright, Meehan, Dolton and Vasicek. *He was interrogated concerning the operation of a gambling house at Polk and Federal street,* and as to appearances before Judge Dougherty and other Judges of the Municipal Court of Chicago. The court permitted cross-examination of plaintiff concerning alleged arrests by Detectives O'Hare, King and Mangan "of the Robbery Detail," and of an arrest by Officers Haight and Ford on September 9, 1946, on charges of assault and battery. When plaintiff stated that he never assaulted anyone, the following occurred: "The Court: Just a minute. Were you arrested by those officers for that charge or not, do you know? A. No, sir, I can't recall. Mr. Dunagan: Q. Do you know Irving Creed? A. Who? Q. Irving Creed, who lives at 720 South Tripp. A. I do not. Q. *Would you say you never assaulted Irving Creed or were never arrested and charged with assault on the complaint of Irving Creed?* A. No, sir. Q. That you deny. Right? A. Yes, sir." The court permitted cross-examination of plaintiff as to an alleged charge that he entered the home of Mabel Whitner on June 29, 1927. When plaintiff denied the charge the following occurred: "Q. *You signed a confession to that, didn't you?* A. No, sir. Mr. McDonnell: Object to this, your Honor. Mr. Dunagan: Pardon? The Court: It was prior to the date—Mr. McDonnell: We are certainly going a long way here and we are going far afield, I think. The Court: *You have alleged that this is a man of good moral character and good, fine reputation, and they have a right to meet that.* Mr. McDonnell: *Not unless I have offered evidence to prove it.* The Court: *Well, you put him on the stand to testify. Now he has a right to go into that.* Mr. McDonnell: Well, I have a right—The Court:

291

All right. The objection is overruled.'' Part of the cross-examination of plaintiff was plainly intended to show that he was guilty of assaulting Irving Creed and that he had signed a confession that he was guilty of entering the home of Mabel Whitner. Such cross-examination was grossly erroneous and prejudicial to the rights of plaintiff. The claim of plaintiff's counsel that there is no competent evidence in the record to show that plaintiff has ever been found guilty of any offense, has not been answered by defendants. It must be remembered that all of the evidence admitted that bore upon other arrests *was admitted in justification of the arrest made November 23, 1946.*

Plaintiff contends that ''the entire closing argument of the defendants is replete with improper comment upon matters outside of the record and with uncalled for, unwarranted and prejudicial statements. There is barely a sentence in the entire argument which was not calculated to arouse the passion and prejudices of the jury.'' We quote certain parts of the argument of counsel for defendants:

''It is the province of a good lawyer to bring forth all the facts, and at the very beginning of this lawsuit, when an opening statement was made to you I took a piece of paper here and I began to tell you in defense of that allegation, about this man's reputation, what his reputation was—a police character, a hoodlum since 1927 when he committed, according to the police record, his first offense.

'' 'Objection,' 'Objection,' 'Objection,' every time I wanted to prove anything by a competent witness pertaining to his reputation. You heard a flood of objections, interruptions, anything to suppress that, because if we might get by that point he might then be able to fool you with this talk of Old Glory and the Constitution.

''A man who sits in his house when he was arrested in his pajamas, and he wasn't booking horses. That

friend of his just happened to call up to see who won the last race at Belmont, and who should rap at the door and come in but Matt Capone, 'Scarface' Al Capone's brother.

"Mr. McDonnell: I object. No evidence of that.

"Mr. Dunagan: Well, isn't he?

"The Court: There is no evidence of the fact that he is a brother, as you term him, of 'Scarface' Al Capone.

"Mr. Dunagan: Matt Capone. And he was arrested and taken to the station and he was taken in by police officers. *He was arrested by the Robbery Detail, he was arrested by the Burglary Detail, he was arrested by the Pickpocket Detail, he was arrested by the gambling squad.* One right after another after another. Picked up in this gambling house and that gambling house. They say he is a man of good repute now.

"He says he is unemployed now. There are sixty-two million people in the United States that are working. Surely there's a job for him if he wants to work. And what did he say? 'I am under the doctor's care.' He's a puny looking sort, isn't he—'under the doctor's care.'

"Well, he wasn't under the doctor's care four months ago, six months ago, four years ago, eight years ago, ten years ago. Outside of five months that he says—and it isn't corroborated—he never had a job in legitimate work except for five months he said he worked as a helper on a truck for the Daily Times.

" . . .

"Oh, you ladies and gentlemen, you lay people, perhaps you don't know how far-reaching, how far this rot has gone in the underworld, pertaining to the kind of men *he is*, by men who refuse to work.

" . . .

"Oh, it's a brazen thing for them to come into a Court of law and sue. It's a brazen, brazen thing. And this homely illustration is all that comes to my mind:

293

You walk through an alley and you see a garbage deposit over there and all of a sudden in the shadows you see a movement and a tail, and under the garbage goes a rat, scurries away. In there stealing. *Makes his living as a parasite. A rat never worked in his life. Scurries away.*

"Then you go into another neighborhood where the garbage is piled high and you find rats. You walk down there in the daytime and you see them. And on occasions you read in the paper where rats will bite children and attack a man. They become so brazen and so bold that they come out into the open.

*"Ladies and gentlemen, as you sit there now, you have seen one of those rats fattening on the land and the money of somebody else—that had the brazenness and brass to go out in the open and attack.*

"Defeat these men if you will, beat them in this lawsuit, and give him a verdict, and send out the word to each policeman in Chicago 'Lay off, fellow, you better not arrest him. They will hire a lawyer, and there are some lawyers who will represent these fellows, whether the case is meritorious or not—

"Mr. McDonnell: I am going to object to that as unfair imputation, your Honor, to counsel.

"The Court: Yes. Any man has a right, *no matter who he is,* to be represented by counsel.

"Mr. Dunagan:—who will bring those actions and this policeman will say 'no, I will face their guns; I have got the courage to grab them, they won't frighten me from a physical standpoint, but when they begin to hit my paycheck through a judgment they are not hurting me then, they are hurting those that I am working for, my wife and my children and my dependents.'

"And what are they going to do? You are going to find the morale of the Police Department shattered.

294

"Oh, it is most important to we who live in this community. This verdict that you are about to render. *You can either say underworld characters go wild, Capones and Rauccis and all the rest of them can go ahead.*

" . . .

"Mr. Dunagan: The laws of this land were made long before the influx of characters that live in the underworld, and the laws of our land that will be given to you by this Judge go all the way back to the Constitution of the United States. He will tell you what certain provisions of the Bill of Rights are.

"Mr. McDonnell: I am objecting to his telling the jury what the Judge is going to do.

"The Court: Yes.

"Mr. Dunagan: I expect him to tell what the law is.

"The Court: Well, you have told them that. I will tell them what the law is.

"Mr. Dunagan: *I expect that. Bear in mind ladies and gentlemen, that the framers of the Constitution and the makers of the law did not make a law for the ilk of him. They made it for the innocent and the unfortunate, not to become a shield for the guilty.*

"*The laws were made for decent people like you, though it has become a shield for individuals like you see before you.*

" . . .

"*Your verdict here may not stand.* It may not be the landmark to help clean out this type of individual from our courts unless you answer that interrogatory, answer it 'no,' and the question is 'Is malice the gist of the action?'

"In other words, *can these men be punished to the extent of putting them in jail if they don't pay their judgment.*

"Mr. McDonnell: I object to that. The jury has nothing to do with that.

295

"The Court: It is merely an interrogatory. The Court will submit it and the jury will answer that by reason of the evidence they have heard and decide whether the answer should be 'yes' or 'no.'"

The language of the court in passing upon the objection of plaintiff to the statement that some lawyers will represent a defendant whether the case is meritorious or not, viz., "Any man has a right, *no matter who he is,* to be represented by counsel," aggravated the harm done by the statement of counsel for defendants. It is unnecessary, in our judgment, to comment, in detail, upon the grossly improper and prejudicial argument of defendants' counsel. The argument was the climax of a determined effort by counsel to bring about a verdict for defendants regardless of the errors that might be committed in reaching that result.

Plaintiff was not accorded a fair and impartial trial, and the judgment of the Superior court of Cook county is reversed, and the cause is remanded for a new trial.

*Judgment reversed, and cause remanded for a new trial.*

FRIEND, P. J., concurs.

SCHWARTZ, J., took no part in the consideration or decision of this case.